JOURNAL ENTRY AND OPINION
{¶ 1} Corey Landers suffered injuries in an automobile accident, and his damages exceeded the limits of liability on both his and the tortfeasor's auto policies. Taking advantage of the holding inScott-Pontzer v. Liberty Mut. Fire Ins. Co. (1999), 85 Ohio St.3d 660, Landers brought suit against his parents' employers, Lucent Technologies, Inc. ("Lucent") and the Cuyahoga County Commissioners, seeking to recover underinsured motorists benefits under policies held by the employers. On cross-motions for summary judgment, the court denied coverage. Landers filed separate appeals from the summary judgments, and we have consolidated them for briefing and disposition. The parties filed stipulations of fact, so there is no issue of material fact and summary judgment may be rendered as a matter of law. See Civ.R. 56.
 I. Lucent Technologies {¶ 2} The court granted Lucent summary judgment on several grounds, but we find one ground dispositive: that Lucent was, for practical purposes, self-insured because its deductible matched its limits of liability; therefore, Lucent had no obligation to carry uninsured motorists coverage.
 {¶ 3} We decided this precise issue in Straubhaar v. Cigna Prop. Casualty Co., Cuyahoga App. No. 81115, 2002-Ohio-4791, and could summarily affirm on that basis alone. We are aware, however, thatStraubhaar was assigned to the accelerated docket of this court and our decision was issued in conclusory form as permitted by App.R. 11.1(E). We therefore take this opportunity to make a fuller statement of the reasons supporting our decision.
 {¶ 4} At the time Lucent entered into the contract of insurance with Reliance National, former R.C. 3937.18(A) generally required that insurance companies offer uninsured/underinsured motorists coverage when issuing automobile liability insurance. Although that section has since been amended to delete any mandatory offer of such coverage, we are obligated to review the policy under the law that existed at the time the parties entered into the contract. See Ross v. Farmers Ins. Group of Cos. (1998), 82 Ohio St.3d 281, syllabus. If coverage is not specifically rejected by the insured, it arises by operation of law. See Abate v.Pioneer Mutual and Casualty Co. (1970), 22 Ohio St.2d 161, paragraph two of syllabus. The Reliance National policy does not contain any uninsured/underinsured motorists coverage, nor is there any evidence that it had been offered and rejected by Lucent. Coverage would therefore arise by operation of law. Under the law existing at the time Lucent and Reliance National entered into the contract of insurance, the law would require that uninsured motorists coverage arise by operation of law.
 {¶ 5} A very significant exception to this law exists in cases involving self-insurers. In Grange Mut. Cas. Co. v. Refiners Transp. Term. Corp. (1986), 21 Ohio St.2d 47, the supreme court held that the R.C. 3937.18 mandatory offer requirement of UM/UIM coverage did not apply to a self-insurer. Quoting Snyder v. Roadway Express, Inc. (1982),7 Ohio App.3d 218, 219, the supreme court stated that a requirement forcing a self-insurer to make an explicit rejection "would result in the absurd `situation where one has the right to reject an offer of insurance to one's self * * * *'; even if applicable, `we believe the insured's rejection must be presumed.'"
 {¶ 6} R.C. 4509.45 permits one to be self-insured by submitting proof of financial responsibility by filing, among other things, a surety bond as provided in R.C. 4509.59 or a certificate of self-insurance as provided in R.C. 4509.72. See R.C. 4509.45(C) and (E). The parties agree that Lucent did not provide either the surety bond or a certificate of self-insurance.
 {¶ 7} But the absence of proof of financial responsibility as allowed by statute is not dispositive. In Grange, the supreme court recognized that entities could be self-insured in the "practical sense," even if they did not comply with the statutory (or "legal") means for proving financial responsibility. The syllabus to Grange states, "[t]he uninsured motorist provisions of R.C. 3937.18 do not apply to either self-insurers or financial responsibility bond principals."
 {¶ 8} We acknowledge that Grange did not involve insurance of the kind involved in this case, but that is a distinction without meaning. The undisputed facts show that Lucent carried what is known as a "fronting" policy with Reliance National Indemnity Company. A fronting policy is a form of self-insurance in which the deductible is identical to the limits of liability, and the insurance company acts only as surety that the holder of the fronting policy will be able to pay any judgment covered by the policy. See Air Liquide America Corp. v. Continental Cas.Co. (C.A. 10, 2000), 217 F.3d 1272, 1274, citing Note, Self-Insurance as Insurance in Liability Policy "Other Insurance" Provisions (1999), 56 Wash. Lee L.Rev. 1245, 1257. The Reliance National policy had liability limits of $2,500,000 and a matching deductible of $2,500,000. In the "practical sense," Reliance National would have no obligation to pay any claim because the Lucent deductible equaled the limits of liability under the policy. The risk of loss stays entirely with Lucent — and this is consistent with the concept of self-insurance. SeeLafferty v. Reliance Ins. Co. (S.D.Ohio 2000), 109 F. Supp.2d 837; Daltonv. Wilson, Franklin App. No. 01 AP-1014, 2002-Ohio-4015, at ¶ 35.
 {¶ 9} It makes no difference to our conclusion that Lucent holds a policy of insurance with Reliance National. Some might argue that this would suggest they are not self-insured, but the practicalities of transacting business dictate the opposite conclusion. A corporation like Lucent would want to hold a policy of insurance, even though its deductible matches the limits of liability, so as to have a clear set of terms that define the limits of its liability. In other words, Reliance National provides Lucent with a policy that sets forth all the terms under which Lucent can be held liable. Reliance National also can deal with the complexities of individual state law and ensure that Lucent carries the type of coverage mandated in a particular state. Moreover, an insurance company has expertise in processing and handling claims, and Lucent clearly paid a premium for that service.
 {¶ 10} We acknowledge, but disagree with, Tucker v. Wilson, Clermont App. No. CA2002-01-002, 2002-Ohio-5142, in which the Twelfth District considered a very similar fronting agreement and held that the insurer retained some risk of loss based on the existence of a bankruptcy clause which "clearly provides that were [the insured] to file bankruptcy or otherwise become insolvent, [the insurer] would not be relieved of its obligation to pay a valid loss during the term of the policy to a third party." Id. at ¶ 14. The court concluded that the operation of the bankruptcy clause would mean that the self-insured would not retain one hundred percent of the loss, "however minuscule the risk" of loss might be. Id.
 {¶ 11} We do not believe that the presence of a bankruptcy clause in an insurance policy is as telling as Tucker believed. That kind of clause simply memorializes R.C. 3929.05, which provides that "the liability of the insurance company is absolute, and the payment of said loss does not depend upon the satisfaction by the assured of a final judgment against him for loss, damage, or death occasioned by such casualty." This simply means that the insured's discharge in bankruptcy would not affect the insurance company's absolute liability under the policy. See Kutza v. Parker (1962), 115 Ohio App. 313. Although the insurance company has absolute liability under the policy in the event that the self-insured is unable to satisfy the judgment, the self-insured in a fronting agreement continues to bear the present risk of loss.
 {¶ 12} But our primary disagreement with Tucker centers on its failure to perceive that a fronting agreement in which an insurance company acts as a surety is, for all practical purposes, no different than the R.C. 4509.59 surety bond which can be used as proof of financial responsibility for self-insurance. A surety is one who agrees to pay money or do any other act in the event that the principal fails to perform an act as set forth in the surety agreement. Under R.C. 4509.59, proof of financial responsibility may be evidenced by the "bond of a surety company." This means that the self-insured bears the burden of meeting any financial obligations that might arise in the event of a motor vehicle accident, and the surety acts to guarantee payment in the event the self-insured is unable to meet those obligations.
 {¶ 13} Lucent's policy with Reliance National bore all the markings of a surety relationship. Lucent agreed to bear all of the loss, with Reliance National agreeing to be responsible for the loss in the event Lucent went into bankruptcy. Perhaps Tucker read too literally an often-cited definition of self-insurance: "Self-insurance is not insurance; it is the antithesis of insurance." See Physicians Ins. Co. ofOhio v. Grandview Hosp. Med. Ctr. (1988), 44 Ohio App.3d 157, 158. That definition cannot be accurate in this context, however, since proof of financial responsibility with a surety bond is no different than a fronting policy in which the insurance company acts — in the practical sense — as a surety in the event the self-insured were to become bankrupt.
 {¶ 14} Finally, even if we are wrong about our conclusion that a fronting policy is similar in application to a surety bond, we respectfully submit that Tucker gave too much credit to the idea that we must apply the law based on the "minuscule" risk that a self-insured would become insolvent. Admittedly, a corporation the size of Lucent Technologies could be subject to insolvency — the Enron and MCI/WorldCom bankruptcies have shown us that much. Nevertheless, Lucent is not currently in bankruptcy and we must assume in the absence of argument or fact to the contrary that it is able to satisfy the full amount of its deductible under the Reliance National policy. At this point in time, Lucent bears the entire risk under the policy. We do not believe that the law should be read so rigidly that it elevates a minuscule chance of risk to the status of fait accompli. As long as there is no proof that the self-insured is not presently capable of satisfying the full amount of the deductible in a fronting agreement, we will not be in any hurry to declare that a party to a fronting agreement is not self-insured.
 {¶ 15} For these reasons, we find that Lucent is self-insured and thus no UM/UIM coverage can arise by operation of law. The court did not err by granting summary judgment to Lucent.
 II. Cuyahoga County Commissioners A {¶ 16} During the relevant time frame, R.C. 3937.18(C) provided that insureds could reject UM/UIM coverage. In Linko v. IndemnityInsurance Co. (2000), 90 Ohio St.3d 445, 449, the supreme court held that a written offer to provide UM/UIM coverage must contain "a brief description of the coverage, the premium for that coverage, and an express statement of the UM/UIM coverage limits." If those elements were not present, a rejection of UM/UIM coverage was deemed ineffective.
 {¶ 17} On October 31, 2001, the General Assembly amended R.C.3937.18(C) to expressly overrule Linko. The new version of the statute simply stated that a named insured or applicant could reject UM/UIM coverage "in writing" and "signed by the named insured or applicant." The commissioners rejected UM/UIM coverage on October 9, 1997. American States concedes that the form signed by the commissioner's representative did not comply with the Linko requirements.
 {¶ 18} The first question presented is whether the Linko elements for rejection of UM/UIM coverage continue to apply after the amendment to R.C. 3937.18(C).
 {¶ 19} The supreme court recently held that they did, in Kemperv. Michigan Millers Mut. Ins. Co., 98 Ohio St.3d 162, 2002-Ohio-7101. The supreme court answered "yes" to this question: "are the requirements ofLinko v. Indemnity Ins. Co., 90 Ohio St.3d 445, 2000-Ohio-92,739 N.E.2d 338, relative to an offer of UM/UIM coverage, applicable to a policy of insurance written after enactment of [1997] HB 261 and before [2001] SB 97?" Because the commissioners signed the rejection after the enactment of HB 260, but before the October 2001 amendments which overruled Linko, the Linko requirements are applicable. American States' failure to include the requisite elements for a knowing rejection means that UM/UIM coverage arises by operation of law.
 {¶ 20} American States acknowledges Linko, but argues on authority of Manalo v. Lumbermans Mut. Ins. Co., Montgomery App. No. 19391, 2003-Ohio-613, that the absence of the Linko requirements are not necessarily determinative of a knowing rejection of UM/UIM coverage where other evidence exists to show that the insured understood the effect of rejecting UM/UIM coverage, particularly when the insured is a "sophisticated large corporation" that was involved in Manalo.
 {¶ 21} Although Manalo reached an interesting result, the facts of that case are significantly different than those presented in this case. Most notably, the insured in Manalo did choose UM/UIM coverage, albeit at a level lower than the liability coverage. The evidence in Manalo also included an affidavit from the risk manager of Avon Products, Inc., which stated that the risk manager was well aware of the requirements for an offer of UM/UIM coverage, that premiums would be increased if he were to select. There is no evidence of that kind in the record before us, so the specific facts would not permit the conclusion that the commissioners made the same kind of knowing rejection of coverage as made in Manalo.
 B {¶ 22} Having found that UM/UIM coverage exists by operation of law, the next set of issues involve the application of Scott-Pontzer. InScott-Pontzer, the supreme court held that the standard definition of a "person" within the UM/UIM provisions of automobile insurance policies covered persons, not vehicles, and that "[i]t would be contrary to previous dictates of this court for us now to interpret the policy language at issue here as providing underinsured motorist insurance protection solely to a corporation without any regard to persons."85 Ohio St.3d at 664. As applied to corporations, the supreme court concluded that the term "you" as contained in the definitions of who was insured included not only a corporation, but also the corporation's employees. Id. Landers' father seeks coverage under a liability policy issued by American States because he is a covered person as defined byScott-Pontzer.
 {¶ 23} In its motion for summary judgment, the commissioners raised the issue whether a political subdivision was bound byScott-Pontzer in light of R.C. 9.83(A), which grants statutory permission for a political subdivision to procure policies of insurance that insure its employees for liability arising from injury "while engaged in the course of their employment or official responsibilities for the state or political subdivision." The commissioners argued that Landers' father, although their employee, had not been engaged in the course of his official responsibilities at the time of Landers' accident.
 {¶ 24} The General Assembly is charged with providing by general law for the organization and government of counties. See Article X, Section 1 of the Ohio Constitution. As creations of the General Assembly, counties derive their power from the General Assembly and are subject to whatever limits are placed upon it by the law. In Commr. ofHamilton Cty. v. Noyes (Sup.Ct. 1875), 5 Ohio Dec.Rep. 281, 221, affirmed (1878), 35 Ohio St. 201, the Superior Court for Hamilton County stated:
 {¶ 25} "These authorities render it clear that county organizations are mere agencies of the state for certain specified purposes; that such powers as they possess and such liabilities as they may create are given by statute; that these statutes are to be strictly construed in favor of the state, which reserves to itself all power not thus delegated * * *." See, also, Geauga Cty. Bd. of Commrs. v. Munn RoadSand Gravel (1993), 67 Ohio St.3d 579, 583 ("Counties, on the other hand, may exercise only those powers affirmatively granted by the General Assembly. Therefore, in the absence of a specific statutory grant of authority, a board of county commissioners is powerless to enact legislation.") (Citations omitted.)
 {¶ 26} Although Scott-Pontzer would normally operate to give rise to coverage for employees of an employer, the commissioner's ability to purchase liability insurance coverage stems from an express grant of authority by the General Assembly. There are two statutes which give the commissioners the authority to purchase motor vehicle insurance: the aforementioned R.C. 9.83(A) and R.C. 307.44, which permits a county board of commissioners to procure policies of insurance insuring officers and employees of the county against liability on account of damage or injury occasioned by the operation of vehicles owned or operated by the county.
 {¶ 27} R.C. 307.44 would not apply since Landers' father was not driving a vehicle "owned or operated by the county."
 {¶ 28} This leaves R.C. 9.83(A) as the enabling source for the commissioners' purchase of insurance. R.C. 9.83(A) states in relevant part:
 {¶ 29} "The state and any political subdivision may procure a policy or policies of insurance insuring its officers and employees against liability for injury, death, or loss to person or property that arises out of the operation of an automobile, truck, motor vehicle with auxiliary equipment, self-propelling equipment or trailer, aircraft, or water craft by the officers or employees while * * *."
 {¶ 30} A county is a political subdivision. See R.C. 2744.01(F). It can therefore procure insurance to its officers and employees for liability arising out of the use of a vehicle, but only to the extent that the injury arose while the officers or employees were "engaged in the course of their employment or official responsibilities for the state or the political subdivision." Landers' father was not engaged in the course of his employment for the commissioners at the time of Landers' accident.
 {¶ 31} We are aware that this court, as well as other courts of appeals, have decided this issue differently in the context of boards of education. In Mizen v. Utica Nat. Ins. Group, 147 Ohio App.3d 274,2002-Ohio-37, the panel considered whether Scott-Pontzer applied to insurance policies purchased by a board of education. R.C. 3313.203
authorizes boards of education to purchase policies of insurance to insure employees against acts or omissions "resulting solely out of his membership on, or employment by, or volunteer services to the board. * * *" the panel held:
 {¶ 32} "We do not agree with the trial court that R.C. 3313.203
limits a school district's authority to purchase insurance coverage. R.C. 3313.203 merely provides that a board of education may purchase liability insurance for employees within the scope of their employment. It does not state that a board of education may not purchase insurance for reasons other than those contained in the statute."
 {¶ 33} Likewise, in Roberts v. Wausa Business Ins. Co.,149 Ohio App.3d 612, 2002-Ohio-4734, appeal allowed, 2003-Ohio-303, the Tenth Appellate District found that even though the General Assembly gave school districts permission to purchase UM/UIM coverage, "there is nothing limiting such coverage to only those employees who are within the scope and course of employment." Id. at ¶ 61.
 {¶ 34} The obvious distinction between the board of education cases and this case filed against the commissioners is that the enabling legislation granting the commisioners permission to purchase liability insurance specifically states that it is limited to occurences which occur in the course and scope of employment. Were we to applyScott-Pontzer to the facts of this case in the manner urged by Landers, it would mean that Landers' father would be entitled to coverage that the commissioners could not, by law, provide to him. Since we are obligated to construe R.C. 9.83(A) strictly in favor of the state, we are compelled to give meaning to the words of the statute. Scott-Pontzer cannot operate to extend coverage to Landers' father beyond that which had been specifically authorized by the General Assembly. For this reason, we find as a matter of law that the court did not err by granting summary judgment, although we do so on an alternative ground.
 {¶ 35} Our ruling necessarily renders moot any consideration of the alternative grounds listed for summary judgment. See App.R. 12(A)(2).
Judgment affirmed.
PATRICIA A. BLACKMON, J., concurs.
DIANE KARPINSKI, J., concurs in judgment only with separate concurring opinion.